**MAX STEINBERG, as Guardian of AKIBA STEINBERG, v. BEN SHADER, et ux.**

23 So. (2nd) 94
July 24, 1945
Rehearing denied Sept. 10, 1945.

June Term, 1945
Division B

*Giles F. Lewis,* for appellant.
*Fishback, Smith & Williams,* for appellees.

THOMAS, J.:

This was a suit by a guardian seeking a decree setting aside a conveyance made by his ward and establishing a lien on certain property for the difference between the amount originally paid by the ward and the amount he eventually received upon reconveyance of the property to his grantors.

For many years Akiba Steinberg, now the ward of Max Steinberg, had suffered from dementia praecox. He came to Orlando where he consulted Dr. William Henry Spiers, a specialist on mental diseases. Meanwhile he had become acquainted with the appellees who operated a dairy and grove in Orange County. As a result of negotiations between the parties, appellees on 10 January 1940 conveyed to Akiba Steinberg an undivided one-third interest in the grove, the dairy, and the land on which they were situated for a consideration of $11,500 in cash and the assumption by him of one-third of an outstanding mortgage of $7,500. On 25 February 1941 Akiba Steinberg reconveyed to the appellees the property he had received from them, they paying to him the sum of $6,000 in cash and assuming the unpaid indebtedness.

On the theory that Akiba Steinberg was incompetent at all times to deal with the appellees the bill was filed in his behalf seeking the recovery from appellees of $5,500 and interest on $11,500, less any money paid him on a drawing account.

We proceed now to an examination of the testimony given by the alienist, Dr. Spiers, and the lay witnesses to determine whether there was sufficient basis in the record to justify the chancellor's view that the bill should be dismissed.

Dr. Spiers said that Akiba Steinberg had consulted him and had been treated by him for about three months. The patient possessed normal mental capacities, but had a delusion that foul odors emanated from his body. He responded to treatment and improved considerably. When Steinberg and the Shaders were negotiating toward an association in the dairy and grove business Ben Shader consulted the physician about his prospective partner's condition and was told that "he (Steinberg) was mentally competent and capable of making any transaction." At the time the doctor considered his patient competent "because there was no disorder of consciousness, and he had a thorough appreciation of values." The transaction was consummated; Steinberg removed to the place occupied by the Shaders, and entered actively into the business they were conducting. The hallucination about an unpleasant body odor continued, however, and as time passed he became obsessed with the idea that people were bothering him at night; that he could hear a woman singing; and that voices kept accusing him of malodorousness. Dr. Spiers testified that the ailment from which Akiba Steinberg suffered, dementia praecox, was a definitely known mental abnormality. Elaborating, he said that one afflicted with this disease was not confused, had no disorder of consciousness, had a keen memory. A person so afflicted, he continued, could understand his situation in life, his property and surroundings, and could have a mentality sufficient to enter into contracts. To repeat, he said these capabilities were possessed by Akiba Steinberg.

In support of the doctor's appraisal of the mental qualities of his patient there was testimony from several lay witnesses who had been in a position to observe Akiba Steinberg. For instance, a prominent attorney of Orlando had drawn the original agreement between Steinberg and the Shaders. Not only was he familiar with the former's actions in connection with this business transaction, but he had on many occasions met him socially and engaged in conversations with him on various subjects. They had had extended discussions on varied topics such as the Bible, literature, the Zionist move-ment, history, the arts, and science. The lawyer himself let-

tered, considered Steinberg a person of sound views, definite opinions, and one not only well read but definitely in touch with his environment and his situation in life. When the partnership was drawing to a close Akiba Steinberg consulted another attorney in the City of Orlando about the most practical way of dissolving the partnership which existed between him and the Shaders. This attorney, too, considered him a bright, well educated man. The merchant who sold feed to the dairy and dealt with Steinberg considered him very shrewd and possessed of a keen mind. A dairyman in the employ of Steinberg and appellees observed him daily and never saw him do anything or heard him say anything that would arouse suspicion that he was not normal mentally.

Evidently Steinberg took a real part in the operation of the dairy, purchasing feed, keeping account of products sold, and so forth. The operator of a neighboring dairy testified that he saw Steinberg probably once each week during the period he was associated with the appellees, from January, 1940, until February 1941. He said that his principal transaction with Steinberg occurred shortly before the partnership was formed, when he and Ben Shader spent an hour or an hour and a half discussing with the witness what he defined as "the base proposition," a system employed by dairymen. This plan, stated the witness, was very technical and difficult to comprehend, yet Steinberg grasped it apparently as a normal person would, and he noticed nothing in the conduct of Steinberg to indicate that he was not mentally sound. A former appraiser of the Federal Land Bank, who incidentally, was a witness to the signature of Akiba Steinberg at the time he reconveyed to appellees, testified that on the two occasions he saw Steinberg he noticed nothing in his behavior to suggest that he was not a normal person.

So the experiences and observations of these witnesses from different walks of life, coupled with the expert opinion of one trained to diagnose and treat mental diseases, seem to support abundantly the view of the chancellor that undue advantage had not been taken of a person so handicapped as to be unable to cope with such problems as sprang from the negotiations and the relationship which followed them. We

understand the hazard of fastening legal principles to current opinions of those schooled in science progressing so rapidly as medicine. We can imagine how strange a pronouncement on some ancient legal concept made at the time bleeding was an accepted treatment and based on that theory would seem in the day of penicillin and sulfa drugs. But the statements of Dr. Spiers, whose qualifications are unquestioned and whose views are unimpeached, that one suffering from dementia pracox to the extreme of hearing weird accusing voices was yet capable of attending sensibly to business affairs amply justified the chancellor's conclusion. It is upon this testimony of the expert and lay witnesses presently before us that the controversy must be decided.

We have studied also those parts of the record showing the appraisal made by an officer of Central Florida Production Credit Association at the time Steinberg conveyed back to the Shaders, and have not found such a discrepancy between the amount he was paid and the third of the value fixed by the appraiser as to indicate that he was treated unfairly by his partners.

The circumstances described by the witnesses, whom the chancellor was justified in believing, established no such incapacity on the part of Akiba Steinberg as to vitiate the transactions we have described. It appears to us from the record that it could not be said he could not, or did not, comprehend the nature of his dealings with the appellees, that he was unduly influenced, or that the consideration was insufficient. We think the chancellor was warranted in believing that there had been no fraud or imposition upon Akiba Steinberg. Appellees seem to have acted in utmost good faith. Doubtless their association with Akiba Steinberg resulted as much from common interests as from hope of profit. All were orthodox Jews. Their religious training, habits, and tradition had drawn them together. Akiba Steinberg was also attracted to appellees because the life on the dairy farm would probably halt the progress of his disease, even if it would not give him permanent relief. It is true that it cannot be said appellees were ignorant of his condition when they began to deal with him because they had consulted his physician before

forming the association.   This indicates a purpose to treat him fairly rather than to take advantage of his plight.   The information they received from the man who was in the best position to know was certainly reassuring, and by no means could it be considered as notice that Steinberg was incapable of contracting.

In view of the testimony of the appraiser, present for the very purpose of making a loan on the property, it does not seem that there was such á disparity in the value of his third and the amount he received as to indicate overreaching on the part of the appellees.

Our perusal of the record convinces us that the appellees acted in good faith and took no undue advantage of their unfortunate associate.   We feel constrained to approve the ruling of the chancellor.

Affirmed.

CHAPMAN, C. J., BROWN and SEBRING, JJ., concur.

